UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
JULIA BASILE,

                          Plaintiff,

            -against-

WALTER SPAGNOLA, individually,                    07 Civ. 11247  (CLB/LMS)
DONNY ESCHRICH, individually,
KEVIN DELOWE, individually,
RICHARD IUELE, individually,
FABIO AMENDOLA, individually, and
NEW YORK STATE THRUWAY
AUTHORITY,

                          Defendants.
-----------------------------------------------------------x


# PLAINTIFF'S MEMORANDUM OF LAW
# IN OPPOSITION TO MOTION TO DISMISS

## Preliminary Statement

This memorandum of law is submitted on behalf of Plaintiff Julia Basile in

opposition to the 12(b)(1)(6) motion, made by the collectively represented Defendants

(Eschrich, DeLowe, Iuele, Mehta and the Thruway Authority) and separately represented

Walter Spagnola, to dismiss the first amended complaint in this action.


## Nature of the Action

This is an action for compensatory and punitive damages proximately

resulting from Defendants' conduct, engaged in while acting in concert and under

color of New York State law, that violated Plaintiffs rights as guaranteed her by

reason of 42 U.S.C. § 1985(2), 42 U.S.C. §1983, Title VII, 42 U.S.C. §2000e

1

*et . seq.*, and Section 296 *et. seq* of the New York State Executive Law [First Amended Complaint ("FAC"), para. 1].

Jurisdiction

The Court's jurisdiction is invoked pursuant to 28 U.S.C. §§1331, 1343. On February 2, 2005, Plaintiff duly filed a Charge of Discrimination (#165200500490) premised upon "sex" and "retaliation" with the United States Equal Employment Opportunity Commission (*See* 2005 Charge, annexed to Lovett Affirmation). A Notice of Right to Sue was thereafter issued by the United States Department of Justice on November 29, 2005. Since this action alleges retaliation by reason of Plaintiff's having previously filed an EEOC charge, received a Notice of Right to Sue, and prosecuted that the resulting Title VII claim against the New York State Thruway Authority, the filing of a second Charge of Discrimination and/or the receipt of a second Notice of Right to Sue is not required as a matter of law. Williams v. New York City Housing Authority, 458 F.3d 67, 70, ftn. 1 (2d Cir. 2006); Butts v. City of New York Department of Housing Preservation & Development, 990 F.2d 1397, 1401-3 (2d Cir. 1993). Plaintiff's supplemental state law claim is interposed pursuant to 28 U.S.C. §1367. *Id.* At 2.

The Presently Incontrovertible Factual Allegations Set Forth in the FAC

*The Parties*

Plaintiff JULIA BASILE, a thirty-four year old single mother, is a citizen of the United States, a domiciliary of the State of New York, and a resident of the County of Rockland. At all times relevant to this complaint she has been employed by the New York

2

State Thruway Authority (hereinafter "Authority") since April 2003 until recently as the only female welder assigned to work on the Tappan Zee Bridge. In 2005 she filed a Title VII and 42 U.S.C. § 1983 civil rights action against the Authority, Defendant Spagnola and other Authority officials/employees by reason of a gender-based hostile work environment. <u>Basile v. Spagnola,</u> 05 Civ. 10699 (LMS)(hereinafter "<u>Basile I</u>"). As against Defendant Spagnola the case resulted in a plaintiff's jury verdict in the spring of 2007 in the principal sum of $200,000 - - $50,000 of which was punitive damages. In 2008 Plaintiff was forced by reason of her gender to relocate to a different work location within the Authority to avoid her being killed by co-workers as set forth *infra. Id.* at 3.

Defendant WALTER SPAGNOLA (hereinafter "Spagnola"), who is sued in his individual and personal capacities only, at all times relevant to this complaint has for years been employed by the Authority as a "Supervising Bridge Painter" assigned to the Tappan Zee Bridge (hereinafter the "Bridge"). As such, and by reason of his seniority and political connections in the Authority, he *de facto* controls: i) the on-the-job conduct and/or misconduct of many of the Authority employees assigned to the Bridge, including each of his individually named co-defendants; and ii) many of the illegal and unauthorized workplace activities on the Bridge, including the circumstances referenced *infra*. Since Plaintiff's commencement of employment Spagnola has sexually abused her and *inter alia* stalked her in the workplace. Since the verdict in <u>Basile I</u> he has re-doubled his stalking activities with respect to Plaintiff - - all with the knowing consent and/or encouragement of his co-defendants. Spagnola's conduct as alleged herein has nothing whatsoever to do with his duties and/or responsibilities as an employee of the Authority; that conduct was in fact motivated by his personal stake in illegal conduct

3

intended to cause Plaintiff's death because: i) as a female she not only refused to accede to his personal sexual entreaties, but openly opposed that illegal conduct; ii) she filed a Charge of Discrimination with the EEOC under Title VII because of Spagnola's gender discriminatory conduct as countenanced by the Authority; iii) she received a Notice of Right to Sue, and; iv) she successfully sued him for that unlawful conduct. Prior to Plaintiff's coerced relocation as set forth *supra* she repeatedly without success implored the Authority to transfer Spagnola from the Tappan Zee Bridge to a different work location in order to afford Plaintiff as safe work environment. The Authority refused to do so, by reason of Spagnola's gender, despite the jury verdict rendered in Basile 1. *Id.* at 4.

Defendant DONNY ESCHRICH (hereinafter "Eschrich"), who is sued in his individual and personal capacities only, at all times relevant to this complaint was employed by the Authority as a "Supervising Bridge Painter II", assigned to the Bridge. Eschrich, as a personal friend of Spanola and out of personal animus he harbors towards Plaintiff by reason of her gender, her opposition to Spagnola's sex-based discrimination in the workplace, her filing the said Charge of Discrimination with the EEOC, her receipt of a Notice of Right to Sue, and/or the jury verdict in Basile 1 , in or about August of 2007 entered in to a conspiratorial agreement (hereinafter the "conspiracy" or "plan") with Spagnola and co-defendants DeLowe, Mehta and Iuele - - known to and approved by administrators of the Authority with final, discretionary decision making authority regarding the conduct set forth *infra* - - to kill and/or cause the death of Plaintiff. Eschrich's conduct as alleged *infra* had nothing whatsoever to do with his duties and/or responsibilities as an employee of the Authority. In that connection Eschrich

4

had a personal, not professional and/or corporate stake in causing Plaintiff's death. *Id.* at 6.

Defendant RICHARD IUELE (hereinafter "Iuele"), who is sued in his individual and personal capacities only, at all times relevant to this complaint was employed by the Authority as a "Bridge Maintenance Engineer", assigned to the Bridge. Iuele, also a friend of Spagnola who harbors the same animus towards Plaintiff as set forth with respect to Spagnola and Eschrich, knowingly and intentionally agreed to participate in the conspiracy in which he had the same referenced personal stake in causing Plaintiff's death. *Id.* at 7.

Defendant KEVIN DELOWE (hereinafter "DeLowe"), who is sued in his individual and personal capacities, at all times relevant to this complaint was employed by the Authority as a "Rigger" (whose function is *inter alia* to prepare scaffolding used in work assignments by amongst others the Plaintiff) assigned to the Bridge. DeLowe, another friend of Spanola who harbors the same animus towards Plaintiff as set forth with respect to Spagnola, Eschrich and Iuele, also knowingly and intentionally agreed to participate in the conspiracy. He also had the same referenced personal stake in causing Plaintiff's death. *Id.* at 8.

Defendant RAMESH MEHTA (hereinafter "Mehta"), who is sued in his individual and personal capacities, at all times relevant to this complaint was employed by the Authority as the Director of the New York Region. He like his individually named co-defendants knowingly and intentionally agreed to participate in the conspiracy - - motivated by the same animus referenced *supra* and the same personal stake in causing Plaintiff's death. *Id.* at 9.

Defendant NEW YORK STATE THRUWAY AUTHORITY (hereinafter "Authority") is a public authority created by and existing pursuant to the laws of the State of New York. As such the Authority operates/maintains the Bridge. The Authority was a named Defendant in <u>Basile I</u> and monitored through its counsel the trial in that action. By reason of <u>Basile I</u> the Authority has intentionally encouraged and condoned the individually named Defendants conspiratorial plan to retaliate against Plaintiff by reason of her: i) opposition to Spagnola's sexual entreaties; ii) filing the Charge of Discrimination with the EEOC; iii) receiving the Notice of Right to Sue; iv) prosecution of a Title VII claim against the Authority; and v) obtaining the verdict in that action. *Id.* at 10.


*The Material Facts*

In furtherance of Defendants' plan, and in connection with the first attempt by them to kill Plaintiff and/or cause her death, Defendants placed her welding truck in gear causing it to slowly roll forward on the Bridge while Plaintiff was suspended under the Bridge using a torch in connection with welding. But for the fortuitous intervention of Plaintiff's "helper", who stopped the truck and placed it in "park", the truck's motion would have severed the acetylene and oxygen lines that ran from the truck to Plaintiff's welding equipment under the Bridge causing a massive explosion and fireball with her certain resulting fatality - - along with extensive structural damage to the Bridge and/or serious physical injuries or death to motorists on the Bridge. *Id.* at 11.

Thereafter Defendants ordered Plaintiff to perform work on a scaffolding that had been deliberately, defectively rigged (lacking "swing lows", "ties" and "clamps",

6

leaving the scaffolding unsecured to the Bridge) with the objective of having Plaintiff

plummet from the scaffolding approximately two hundred feet into the Hudson River.

Fortuitously Plaintiff and her assigned co-worker noticed the defects and avoided

certain serious injury or death by refusing to comply with Defendants' order. In that

connection DeLowe subsequently expressly admitted to Plaintiff's co-worker that the

defective rigging had been intentional and was calculated to injure the "bitch" and "break

Julia's balls". *Id.* at 12.

      In a third attempt to kill and/or cause Plaintiff's death, Defendants punctured a

high pressure air hose, a circumstance that was intended to cause the hose (under 1,500

pounds of pressure) to rupture when Plaintiff was using it while suspended under the

Bridge. Fortuitously while Plaintiff's assigned co-worker instead began using the air hose

below the surface of the Bridge Plaintiff, on the Bridge surface, saw the line begin to

shred and shut off the compressor - - preventing a blast of pressurized air from blowing her

co-worker off of the scaffolding and into the River, where he would have certainly been

killed.

      By way of multiple other retaliatory attempts to sabotage Plaintiffs work

environment and cause her serious bodily injury or death Defendants have:

a) repeatedly tampered with her welding truck, rendering it unsafe to operate;

b) repeatedly tampered with combustible fuel tanks, required to be used by her in

connection with welding, with a view towards causing them to explode; and, *inter*

*alia*, c) repeatedly tampered with her air compressor with a view towards causing an

explosion while Plaintiff was using it. *Id.* at 14.

Most recently when Plaintiff's immediate supervisor confronted Eschrich regarding the multiple attempts on Plaintiff's life and requested his active intervention to prevent a tragedy, Eschrich responded: "She deserves whatever she gets". *Id.* at 15.

With respect to the sabotage and attempts on her life Plaintiff has repeatedly reported these circumstances to the New York State Police, who have refused out of deference to the well-established lawless behavior routinely engaged in by the Authority and its officials/employees, to investigate and/or take any proactive law enforcement action to protect her from the Defendants' criminal misconduct. *Id.* at 16.

As a proximate result of Defendants' conduct Plaintiff has been caused to: endure for months, and continuing to date, relentless fear and terror; suffer extreme emotional upset; suffer extreme anxiety; suffer financial damages; endure public humiliation, public degradation, public embarrassment, public ridicule, public shame; suffer on-going gender discriminatory violations of her right to Equal Protection because *inter alia* she successfully sued Spagnola for violations of her rights as guaranteed by 42 U.S.C. § 1983; suffer on-going retaliation by the Authority because in Basile I Plaintiff named the Authority as a defendant with respect to a Title VII claim; suffer on-going death threats and related retaliatory conduct because she testified against Spagnola and the Authority in Federal Court during her trial; suffer denials of her right to Equal Protection by reason of her gender; suffer daily stalking, harassing and threatening behavior purposefully and openly engaged in by Spanola on the Bridge; suffer a chilling in her prospective exercise of her First Amendment rights to free speech and to petition government for the redress of grievances with respect to criminal wrongdoing engaged in by the Authority including routine on-the-job use of illicit drugs by Authority employees, routine on-the-job card playing and/or gambling by Authority employees, routine on-the-job sleeping by Authority

8

employees, waste of public moneys by the Authority, theft of public property with impunity by

employees of the Authority, and *inter alia* unsafe roadway and structural conditions on and under

the Bridge that daily put motorists who use that Bridge at risk of serious injury or death; and she

has otherwise been rendered sick and sore.


*Plaintiff's Claims*

      On these facts Plaintiff alleges that: the Authority's retaliatory conduct violated her rights

as guaranteed by Title VII (FAC at 16-17); the individually named Defendants violated her right

to Equal Protection (FAC 18-19); the individually named Defendants violated her rights as

guaranteed by 42 U.S.C. §1985(2); the individually named Defendants violated her rights as

guaranteed by the First Amendment (FAC at 22-3); and the individually named Defendants

violated her rights as guaranteed by Section 296 *et. seq.* of the New York State Executive Law.


## POINT I

### THE TITLE VII CLAIM
### IS PROPER AS AGAINST
### THE THRUWAY AUTHORITY

      In February of 2005 Plaintiff duly filed a Charge of Discrimination with the United States

Equal Employment Opportunity Commission alleging discrimination on the basis of both "sex"

and "retaliation" (2005 Charge, annexed to Lovett Affirmation). Following issuance of a Notice

of Right to Sue, Plaintiff in fact did precisely that - - filing a claim against the Thruway Authority

under Title VII and against other individual employees of the Authority including Walter

Spagnola. Although the Title VII claim was dismissed pre-trial, the claims against Spagnola were

tried to a jury with a resulting verdict of $200,000, $50,000 of which was punitive damages.

Because Plaintiff had filed the 2005 "sex" and "retaliation" Charge of Discrimination, and due to further and on-going retaliation resulting both from that filing and the prosecution of the initial law suit Plaintiff instituted this action premised on *inter alia* retaliation without filing an additional Charge of Discrimination against the Thruway Authority with the EEOC.

Against this background the Authority now moves to dismiss the complaint as to the Title VII claim on two grounds: i) by reason of Plaintiff's failure to re-file another Charge of Discrimination with the EEOC, she has allegedly failed to exhaust her administrative remedies; and ii) because in the instant filing she alleges that the attempts to murder her had "nothing whatsoever to do with [with the individually named Defendants'] duties, liability cannot be imputed against the Authority". We disagree.

*A Second Charge of Discrimination was not Required*

As a threshold matter and notwithstanding our belief that a second Charge of Discrimination is unnecessary in this context, a second Charge was in fact filed with the EEOC on March 21, 2008 (*See* 2008 Charge annexed to Lovett Affirmation).

In any event the law is exceeding clear that, under the circumstances presented, the second filing is unnecessary. Alfano v. Costello, 294 F.3d 365, 381 (2d Cir. 2002)("[J]urisdiction exists over Title VII claims only if they have been included in an EEOC charge 'or are based on conduct subsequent to the EEOC charge which is "reasonably related" to that alleged in the EEOC charge . . .Subsequent conduct is reasonably related to conduct in an EEOC charge if: [1] the claim would fall within the reasonably expected scope of an EEOC investigation of the charges of discrimination; [2] it alleges retaliation for filing the EEOC charge; or [3] the plaintiff 'alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC

charge"); <u>Richards v. New York City Police Department</u>, 1999 WL 33288, *6-7 (S.DN.Y.

1999)(same); <u>Butts v. City of New York Department of Housing Preservation and Development</u>,

990 F.2d 1397, 1042 (2d Cir. 1993)(same); <u>Owens v. New York City Housing Authority</u>, 934

F.2d 405, 410-11 (2d Cir. 1991)("It is undisputed that this claim of retaliation arises out of

incidents subsequent to the filing of the EEOC complaint. Our prior rulings make it clear,

however, that her retaliation claim must nonetheless be considered 'reasonably related' to the

complaint she filed with the EEOC"); <u>Legnani v. Alitalia Linee Aeree Italiane</u>, 274 F.2d 683, 686

(2d Cir. 2001("A claim 'alleging retaliation by an employee against and employer for filing' "a

discrimination charge is one type of claim we have recognized as 'reasonably related' to the

underlying discrimination charge"); <u>Almendral v. New York State Office of Mental Health</u>, 743

F.2d 963, 967 (2d Cir. 1984)(same); <u>Kirkland v. Buffalo Board of Education</u>, 622 F.2d 1066,

1068 (2d cir. 1980)(same).

On the facts and circumstances presented by the case at bar it is clear that the instant filing

was proper with regard to the Title VII claim since it alleged retaliation - - just as did the 2005

EEOC Charge - - and the claims in this case would reasonably have been investigated by the

EEOC in connection with that filing.


*Liability May Properly be Imputed to the Thruway Authority In Light of Supervisory Staff
Conduct*

In this case Plaintiff contends that various supervisory personnel employed by the

Thruway Authority (Donny Eschrich, a Supervising Bridge Painter II, Richard Iuele, a Bridge

Maintenance Engineer, and Ramesh Mehta, the Thruway's Director of the New York Region)

acting at the direction of Supervising Bridge Painter I Walter Spagnola, have on several

occasions attempted to kill her and/or cause her death in retaliation for her having filed the 2005

Charge of Discrimination, filed the 2005 civil rights action, and prosecuted against the Authority her underlying Title VII claim (FAC at 11, 12, 13). Additionally she claims that these supervisory personnel, aided by one co-worker (DeLowe) have by way of retaliation repeatedly tampered with her welding truck rendering it unsafe, repeatedly tampered with combustible fuel tanks in order to cause an explosion, and repeatedly tampered with her air compressor with a view towards precipitating an explosion (FAC, para. 14).

In that connection she further alleges that when her immediate supervisor approached Eschrich and asked him to intervene to avert a tragedy, Eschrich refused to do so despite his supervisory authority declaring: "She deserves whatever she gets" (FAC t 15).

Against this background the Authority now argues that because the individually named Defendants' conduct had nothing whatsoever to do with their employment duties and/or responsibilities, the "actions of the individuals who have apparently been accused of trying to kill Plaintiff cannot be imputed to the Authority (Memo at 10). We again disagree.

As a threshold matter Eshrich's refusal to take remedial action as a supervisor (FAC 15) obviously has everything to do with his supervisory powers/authority. His conduct in purposefully condoning the attempts at murder and refusing to prevent them are thus clearly imputable to the Authority.

So too are the actions of his individually named co-defendants. They manifestly are not mere civilian interlopers who randomly, as movants posit, "can break a co-worker's arm as easily as a supervisor", gain access to Plaintiff's equipment and sabotage it under circumstances where only a Thruway employee would appreciate how to do so and what the consequences would be given Plaintiff's work assignment (Memo at 9).

On the contrary, as the Second Circuit opined in <u>Mack v. Otis Elevator</u>, 326 F.3d 116,

123-126 (2d Cir. 2003), upon which movants misplace reliance:

> "The starting point for analyzing employer vicarious liability in a
> Title VII hostile work environment action is to determine whether
> the person who allegedly created that environment is properly
> characterized as having been plaintiff's 'supervisor'. . .[I]t is only
> when a 'supervisor with immediate (or successively higher) authority
> over the employee' has engaged in the complained of conduct that
> the 'employer [may] be subject to vicarious liability. . .Employers are not,
> by contrast, vicariously liable for hostile work environment created
> by a mere co-worker of the victim. . .The [Supreme C]ourt [in <u>Burlington</u>
> <u>Industries v. Ellerth</u>, 524 U.S. 742 (1998)] therefore held that if behavior
> illegal under Title VII culminates in tangible employment action, the
> employer will, *ipso facto*, be vicariously liable for it. 'A tangible
> employment action constitutes a significant change in employment
> status. . .The [Supreme] court [also] concluded that where a tangible
> employment action is not involved: [the] employer is [nonetheless]
> subject to vicarious liability to a victimized employee for an actionable
> hostile work environment created by a supervisor with immediate. . .
> authority over the employee. [But in such cases] a defending employer
> may raise an affirmative defense to liability or damages, subject to
> proof by a preponderance of the evidence. . .The defenses comprises
> two necessary elements: (a) that the employer exercised reasonable
> care to prevent and correct promptly any sexually harassing behavior,

and (b) that the plaintiff employee unreasonably failed to take

advantage of any preventive or corrective opportunities provide by

the employer or to avoid harm otherwise".

Against the law as so-established, it is fairly obvious that when supervisory staff indulge

in multiple attempts to murder a subordinate, and to sabotage her equipment in life threatening

ways, because she has opposed gender discrimination under Title VII, those circumstances

constitute tangible employment action resulting in a "significant change in employment status".

In the alternative, and assuming *arguendo* that repeated attempts to kill a subordinate

does not comprise tangible employment action, as made clear by <u>Mack</u> the Thruway Authority in

this case at best must assert an affirmative defense to the Title VII claim and a motion pursuant

to 12(b) simply will not suffice.


### POINT II

### PLAINTIFF'S EQUAL PROTECTION AND FIRST AMENDMENT CLAIMS AGAINST THE INDIVIDUALLY NAMED DEFENDANTS ARE LEGALLY SUFFICIENT

*First Amendment Chilling*

Entirely misconstruing the first amended complaint as to Plaintiff's free speech claim,

movants argue that her allegations regarding attempts to kill her or cause her injury for filing a

Title VII sexual harassment suit "do not support a [First Amendment claim] under §1983". If in

fact that were what she alleged in her complaint, we would not disagree.

Unfortunately for the individually named Defendants it is Plaintiff's claim that because

of the repeated attempts to kill her she has been prospectively chilled in the exercise of her First

Amendment protected rights and thus will not speak out regarding "criminal wrongdoing

engaged in by the Authority, routine on-the-job use of illicit drugs by Authority employees, routine on-the-job sleeping by Authority employees, waste of public moneys by the Authority, theft of public property with impunity by employees of the Authroity, and *inter alia* unsafe roadway and structural conditions on and under the [Tappan Zee] Bridge that daily put motorists who use that Bridge at risk of serious injury or death" (FAC at 17).

In sum movants' tilting at windmills, rather that the substantive import of the first amended complaint, accomplishes nothing. For as a chilling claim, the complaint is legally sufficient.

*Equal Protection*

On this record it is beyond dispute that Walter Spagnola was found by a federal jury to have subjected Julia Basile to disparate treatment by reason of her gender in connection with her 2005 filing. It is also indisputable at this pre-joinder of issue stage of the litigation that Spagnola has orchestrated the retaliation at issue in this case because Basile "as a female. . .not only refused to accede to his personal sexual entreaties, but openly opposed that illegal conduct; she filed a Charge of Discrimination with the EEOC; she received a Notice of Right to Sue and successfully sued him for sexually abusing and sexually harassing her in the workplace (FAC at 4). It is further beyond dispute that Eschrich, Iuele, DeLowe and Mehta all retaliated against Ms. Basile for the same reason - - her gender and her refusal to accede to Spagnola's sexual misconduct.

Against this factual background, movants baldly assert that Plaintiff alleges "no facts in support" of her Equal Protection claim and that the sole allegation in the first amended complaint going to this claim (as set forth in paragraph "17" of the FAC) was Plaintiff's allegation that the

individually named Defendants "caused her 'to suffer [unspecified] denials of her right to Equal Protection by reason of her gender". Obviously Defendants disregard of the substantive allegations defining her Equal Protection claim do not make them disappear.

Simply specious is movants' straw man argument that a the FAC does not state an Equal Protection claim "by alleging retaliation for a previous lawsuit". She makes no such claim. Rather its Plaintiff's contention that because she is female she had been subjected to equipment sabotage and attempts to murder. In that connection, Plaintiff as the female victim of gender discrimination at the hands of Walter Spagnola has been deliberately accorded disparate treatment by the Authority and its staff in contrast to the treatment accorded Spanola, a male.

Thus following a jury verdict finding Spanola liable for sexually abusing Plaintiff and subjecting her to a gender hostile work environment Plaintiff - - but not Spagnola - - "was forced by reason of her gender to relocate to a different work location within the Authority" (FAC 3). In that connection, and following the trial in Basile I, Plaintiff "repeatedly and without success implored the Authority to transfer Spagnola from the Tappan Zee Bridge to a different work location" in order to afford her a "safe work environment". This the "Authority refused to due . . .by reason of Spagnola's gender" (FAC at 4).


## POINT III

### THE INDIVIDUAL DEFENDANTS ACTED UNDER COLOR OF STATE LAW

Arguing that any civilian interloper could have three times attempted to murder Julia Basile in connection with her job duties, or gained access to her equipment to tamper with it or sabotage it, movants declare that the FAC does not provide any "facts from which one can infer that the individual Defendants committed any wrongs under color of state law" (Memo at 16).

16

The argument, we submit, is utterly specious.

In that connection movants' reliance upon <u>Pitchell v. Callan</u>, 13 F.3d 545 (2d cir. 1994) proves fatal. For as they admit in that action "an off-duty police officer shot a guest in his home" absent an "actual or pretended authority of the state". That of course has nothing to do with Julia Basile's causes of action. For she pleads that each of the individually named Defendants, while at work for the State and on State owned property, engaged in the unlawful conduct cited in the FAC. In short, the individual Defendants are and are alleged to have acted under color of state law.

**POINT IV**

**THE CONSPIRACY CLAIM
IS LEGALLY SUFFICIENT**

Upon the premise that the 1985(3) claim cannot stand "because Plaintiff has not alleged facts that would support a conspiracy" (Memo at 16), the Defendants baldly assert without citation to anything that that pleading employs "merely vague and conclusory statements that track the statutory language". *Id.* 17. The argument is meritless, given movants' later admissions.

Thus they concede (*ibid.*) that Plaintiff must allege "with at least some degree of particularity, overt acts which defendants engaged in which were reasonably related to the promotion of the claimed conspiracy" so as to enable defendants "to prepare their defense intelligently". *Ibid.*

We submit that the complaint is legally sufficient. It is not comprised of either vague or conclusory statements. As a threshold matter each and every attempt to kill Plaintiff and/or to sabotage her work equipment has been reported to the State Police (Tr. 16), a circumstance

which will supplement in detail the complaint and permit the State Police's sister agency, the Authority, access to whatever detail they claim is missing. In the alternative, Plaintiff will either (subject to the Court's permission) serve a Second Amended Complaint with the detail requested or compel disclosure of that data from the State Police and provide it to the Authority. Separate and apart from this source of data, the complaint is quite specific as to who did what by way of conspiratorial conduct.

As set forth in paragraph 15 of the FAC recently Plaintiff's immediate supervisor and related to Eschrich details regarding the multiple attempts to kill her, seeking his intervention to prevent a "tragedy". Eschrich's response, evidencing not only awareness of the unlawful conduct but the illegal motivation that has driven him and his co-conspirators: "She deserves whatever she gets". In other words, because she is female and has opposed gender discrimination in the workplace, death or serious physical injury is fitting.

In that connection the FAC makes it clear that Spagnola, "by reason of his seniority and political connections in the Authority" actually controlled and directed his co-defendants unlawful conduct and has done so with respect to the acts of sabotage and attempted murder (FAC at 4). His motivation, just as that of his co-defendants, is gender driven (FAC 4 – 9). Indeed following the plaintiff's verdict in <u>Basile I</u>, she repeatedly without success implored the Authority to remove Spagnola from the Tappan Zee Bridge in order to afford her a safe work environment; instead the Authority, because of Spagnola's gender facilitated Spagnola's post-verdict on-doing sexual harassment of Plaintiff and ultimately forced Ms. Basile to leave the Bridge and accept a different work assignment (FAC at 4).

Following the jury verdict in <u>Basile I</u> Spagnola has re-doubled his sexual harassment of Plaintiff and orchestrated a plan amongst his co-defendants to kill Ms. Basile (FAC at 4). The

first attempt occurred on the Bridge when (FAC at 11):

> "Defendants placed her welding truck in gear causing it to slowly
> roll forward on the Bridge while Plaintiff was suspended under the
> Bridge using a torch in connection with welding. But for the fortuitous
> intervention of Plaintiff's 'helper', who stopped the truck and placed it
> in 'park', the truck's motion would have severed the acetylene and
> oxygen lines that ran from the truck to Plaintiff's welding equipment under
> the Bridge causing a massive explosion and fireball with her certain
> resulting fatality - - along with extensive structural damage to the Bridge
> and/or serious physical injuries or death to motorists on the Bridge".

The second attempt (FAC at 12), ordered by Spagnola, occurred when:

> "Defendants ordered Plaintiff to perform work on a scaffolding that
> had been deliberately, defectively rigged (lacking 'swing lows', 'ties',
> and 'clamps', leaving the scaffolding unsecured to the Bridge) with the
> objective of having Plaintiff plummet from the scaffolding approximately
> two hundred feet into the Hudson River. Fortuitously Plaintiff and her
> assigned co-worker noticed the defects and avoided certain serious
> injury or death by refusing to comply with Defendants' order."

With respect to this attempt at murder, DeLowe expressly admitted that the defective rigging had been intentional and was calculated to injure the "bitch" and "break Julia's balls". *Ibid.*

The third attempt at homicide (FAC at 13) occurred when the:

> "Defendants punctured a high pressure air hose, a circumstance that was
> intended to cause the hose (under 1,500 pounds of pressure) to rupture when

plaintiff was using it while suspended under the Bridge. Fortuitously while plaintiff's assigned co-worker instead began using the air hose below the surface of the Bridge, Plaintiff, on the Bridge surface, saw the line begin to shred and shut off the compressor - - preventing a blast of pressurized air from blowing her co-worker off the *scaffolding and into the River, where he would have certainly been killed".

In addition to these three attempts, Defendants have engaged in repeated acts of sabotage directed at Plaintiff's equipment including: a) repeatedly tampering with her welding truck, rendering it unsafe to operate; b) repeatedly tampering with combustible fuel tanks, required to be used by her in connection with welding, with a view towards causing them to explode; and c) repeatedly tampering with her air compressor with a view towards causing an explosion while Plaintiff was using it".

Against this factual background, which at this juncture in the litigation must not only be accepted as true but from which all inferences favorable to the Plaintiff must be drawn, movants' apparently canned legal arguments appear superficial at best.

Contrary to Defendants' assertion (Memorandum at 16, 17), these factual assertions are not "[v]ague [or] conclusory". The FAC, notwithstanding movants' contention to the contrary (*ibid.*) provides specific details regarding the steps taken in furtherance of the conspiratorial plan - - as well as multiple admissions against interest by two of the Defendants.

As urged by movants, Plaintiff indeed alleges specific facts, coupled with admissions, that lead to a compelling inference of a conspiracy to deprive her of her federally protected civil rights (Memorandum at 17). Also as urged by the movants, the factual details asserted in the FAC are more than sufficient to demonstrate a meeting of the minds of the co-conspirators and

their "unlawful end[game]". And as urged by movants, the factual details also "demonstrate concerted action". Of course in that connection Eshrich and DeLowe's remarks, uttered concerning the repeated attempts to kill Ms. Basile's tell it all. DeLowe admitted that the defectively rigged scaffolding was intended to seriously injure the "bitch", or as he somewhat unintelligently remarked: "to break her balls". Eschrich, fully appreciating the planned killing of Julia Basile and the steps taken in furtherance of that objective bluntly observed: "She deserves whatever she gets".

According to movants the FAC must allege "with at least some degree of particularity, overt acts which defendants engaged in which were reasonably related to the promotion of the claimed conspiracy" (Memorandum at 17). Most assuredly the FAC does precisely that.

According to movants the FAC must "provide specific instances of misconduct, including time and place, which specify in detail the factual basis necessary to enable defendants to prepare their defense intelligently" (Memorandum at 17). The time frame at issue commenced following the spring 2007 jury verdict in <u>Basile I</u>. All of the events, by way of time frame, occurred during the work day on the Tappan Zee. Each of the events was reported by Basile to the New York State Police. And the instances of misconduct are plenty specific. In sum, if all Defendants are now complaining about is the absence of a more specific date for each attempted murder, that will be supplied by the State Police and/or Plaintiff in discovery - - assuming *arguendo* that the Defendants do not presently recall when they attempted to commit her murder. And as to the tampering with her equipment, that circumstance was "repeated" following the jury verdict.

Finally as to movants argument that the 1985 claim must be dismissed on an intra-corporate conspiracy theory (Memorandum at 18), we submit that that assertion is simply devoid

of merit. As made clear by the FAC, each of the individually named Defendants' motivation to participate in the conspiracy to kill or maim Plaintiff had nothing to do with their job duties or responsibilities. Rather it was inspired by their respective "personal stake in illegal conduct intended to cause Plaintiff's death because: i) as a female she not only refused to accede to [Spagnola's] personal sexual entreaties, but openly opposed that conduct; ii) she filed a Charge of Discrimination with the EEOC under Title VII because of Spagnola's gender discriminatory conduct as countenanced by the Authority; iii) she received a Notice of Right to Sue, and; iv) she sued him for that unlawful conduct" (FAC at 4 – 10). Under these circumstances there is no intra-corporate conspiracy defense. Girard v. 94th Street & Fifth Avenue Corp, 530 F.2d 66, 71-2 (2d Cir. 1976); Rodriguez v. City of New York, 2008 WL 420015, *25 (E.D.N.Y. 2008); Crews v. County of Nassau, 2007 WL 4591325, *12 (E.D.N.Y., 2007); Little v. City of New York, 487 F. Supp.2d 426, 442 (S.D.N.Y., 2007); In re Parmalat Securities Litigation, 479 F.Supp.2d 332, 344-5 (S.D.N.Y., 2007); Tardd v. Brookhaven National Laboratory, 407 F.Supp.2d 404, 414 (E.D.N.Y., 2006); Salgado v. City of New York, 2001 WL 290051, *8 (S.D.N.Y. 2001); Roninger v. McCall, 22 F.Supp. 2d 156, 168-9 (S.D.N.Y., 2000); Rini v. Zwirn, 886 F.Supp. 270, 293 (E.D.N.Y. 1995); Yeardon v. New York City Transit Authority, 719 F. Supp. 204, 207 (S.D.N.Y. 1989).

## POINT V

### THE SUPPLEMENTAL STATE
### LAW CLAIMS MUST BE TRIED
### TO A JURY

Upon the self-congratulatory pronouncement that "Plaintiff cannot maintain any of her first four [federal] claims" (Memo at 19), movants contend that the supplemental state law

claims must be dismissed. Since we believe that movants are dead wrong with respect to the

First, Second, Third and Fourth Claims, their argument as to the state law claims is irrelevant.

<u>Conclusion</u>

The motion should in all respects be denied. In the alternative the Court's permission is

requested to serve, should the Court deem it necessary, a Second Amended Complaint.

Dated: White Plains, N.Y.
        March 24, 2008

LOVETT & GOULD, LLP
By:
Jonathan Lovett (4854)
Attorneys for Plaintiff
222 Bloomingdale Road
White Plains, N.Y. 10605
914-428-8401